UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**JOANNA DYKES; DAVID WALKER,**
by and through his next friend, Michele
Beauregard; **LORETTA DAVIS,** by and through
her next Friend, Trish Mlekodaj; **HEATHER
YOUNG,** by and through her next friend Robert
Stark; **MICHELLE CONGDEN; AMANDA
PIVINSKI; JOSHUA WOODWARD;
ALYSSA FERRARO,** by and through her
next friend, Sharon Ferraro and **DISABILITY
RIGHTS FLORIDA, Inc., a Florida non-profit
corporation,**

                    Plaintiffs,

v.                                                    **CASE NO.:**

**ELIZABETH DUDEK** in her official
capacity as Secretary of the Florida Agency
for Health Care Administration, and
**BRIAN VAUGHAN** in his official capacity
as (Interim) Director of the Florida Agency
for Persons with Disabilities, and
**RICK SCOTT** in his official capacity
as Governor of the State of Florida.

                    Defendants.

_____/


**AMENDED CLASS ACTION COMPLAINT
FOR
<u>DECLARATORY AND INJUNCTIVE RELIEF</u>**


1.      This is a statewide class action brought on behalf of over 19,000 individuals with

developmental disabilities, as defined by Section 393.063(9) of the Florida Statutes,

eligible to receive services through Florida Medicaid in intermediate care facilities for the

developmentally disabled (ICF/DD)[1] and in the community under Florida's Home and

Community Based Services Waivers for persons with developmental disabilities ("DD

Waivers").

2.      The plaintiffs are persons who are unable to fully care for themselves and,

therefore, require various degrees of care, treatment, and/or habilitation. The plaintiffs

seek appropriate day services, therapies, behavioral supports, residential placement, and

other home and community based services to enable them to reside in the most integrated

setting possible.

3.      Some plaintiffs reside in private ICF/DDs or nursing homes where they have been

confined to a category of waiting persons that will never move forward on the list.

4.      Some plaintiffs reside in their families' homes and have been on the DD Waivers

waitlist for over five years. They will not be prioritized for the DD Waiver until their

caretakers succumb to incapacitation or death.

5.      Plaintiffs have been placed on waiting lists for enrollment on the DD Waivers

where they languish for years without services thereby placing them at risk of

institutionalization and regression of skills and therapies learned from educational

programs.

6.      The defendants have failed to provide the plaintiffs with appropriate community

---

[1] On February 3, 2011, Rule 59G-6.045 of the Florida Administrative Code - Payment Methodology for Services in Facilities Not Publicly Owned and Publicly Operated (Facilities Formerly Known as ICF/DD Facilities) - was filed.  For simplicity, the term "ICF/DD" will be used herein.

2

services through the DD Waivers in order to avoid institutionalization.[2]

7.      Through statute and rules, the DD Waivers' waitlist categories prioritize those persons deemed to be in crisis. Rule 65G-1.047 of the Florida Administrative Code defines crisis as meeting one of three conditions:

   a.   "First priority" crisis category: The applicant is currently homeless, living in a homeless shelter, or living with relatives in an unsafe environment.

   b.   "Second priority" crisis category: The applicant exhibits behaviors that, without provision of immediate waiver services, may create a life-threatening situation for the applicant or others, or that may result in bodily harm to the applicant or others requiring emergency medical care from a physician.

   c.   "Third priority" crisis category: The applicant's current caregiver is in extreme duress and is no longer able to provide for the applicant's health and safety because of illness, injury, or advanced age. The applicant needs immediate waiver services to remain living with the caregiver or to relocate to an alternative living arrangement.

8.      Those persons on the waitlist that do not meet one of the three crisis priorities are further categorized into seven other categories pursuant to Section 393.065(5) of the

---

[2] DD Waiver services that are available include the following: Adult Day Training, Adult Dental Services, Behavior Analysis Services, Behavior Assistant Services, Companion Services, Consumable Medical Supplies, Dietitian Services, Durable Medical Equipment and Supplies, Environmental Accessibility Adaptations, In-Home Support Services, Medication Review, Occupational Therapy, Personal Care Assistance, Personal Emergency Response Systems, Physical Therapy, Private Duty Nursing, Residential Habilitation Services, Residential Nursing Services, Respiratory Therapy, Respite Care, Skilled Nursing, Special Medical Home Care, Specialized Mental Health Services, Speech Therapy, Support Coordination, Supported Employment, Supported Living Coaching, and Transportation.

Florida Statutes.

9.     For at least the past five years, only those persons deemed to be in crisis were enrolled on the DD Waiver.

10.     For at least the past five years, the defendants have limited the number of crisis enrollments to only those that could be served with funding saved through attrition (*i.e.*, when a current enrollee dies, becomes ineligible or moves out of state).

11.     The defendants' statutes, rules and policies for waitlist management force persons with developmental disabilities currently residing in the community to forgo services completely while waiting for one of the three desperate and dangerous categories of crisis to take hold.

12.     For those persons already institutionalized, they will never be enrolled in the DD Waivers so long as the State continues to only fund enrollments of those in crisis.

13.     The plaintiffs seek to remedy the pervasive systemic and continuing failure of the defendants to provide necessary services in a reasonably prompt manner to meet their needs, as required by the integration mandate of Title II of the Americans with Disabilities Act ("ADA"). *See* 28 C.F.R. § 35.130(d).

14.     The plaintiffs seek a declaration that denial of adequate services with reasonable promptness, denial of notice of prioritization on the waitlist, and the denial of freedom of choice of those waitlisted persons violates Title XIX of the Social Security Act, 42 U.S.C. § 1396a *et seq.*, 42 C.F.R. § 431 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (ADA), and 42 U.S.C. § 1983.

## JURISDICTION

15.     This Court has jurisdiction over the claims presented in this action pursuant to 28 U.S.C. § 1331.   Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

16.     The plaintiffs' claims are predicated upon the applicable provisions of the Medicaid Act, namely 42 U.S.C. §§ 1396a(a)(8) & (23) & 42 C.F.R. § 435.930, requiring the delivery of Medicaid services to eligible persons with reasonable promptness and freedom of choice of providers; the ADA, 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Plaintiffs' claims for relief are also predicated upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights privileges and immunities secured by the Constitution and laws of the United States.

## NAMED PLAINTIFFS

## JOANNA DYKES

17.     The Plaintiff, Joanna Dykes ("DYKES"), is a 23-year old woman diagnosed with an intellectual disability[3] and mental illness. She has no family and resides in an ICF/DD

---

[3] The developmental disabilities community strongly encourages use of the term "intellectual disability" in lieu of "mental retardation" or "retardation." *See* Shalock, Luckasson, and Shogren. "The Renaming of 'Mental Retardation:' Understanding the Change to the Term 'Intellectual Disability." Intellectual and Developmental Disabilities. Vol. 45, No. 2: 116-124 (2007). *See also* Pub. Law. 111-256, § 1, Oct. 5, 2010, 124 Stat. 2643 ("Rosa's Law"). "Retardation" is defined in Section 393.063 of the Florida Statutes. For purposes of consistency, since the State of Florida and APD still use the term "retardation" or "mental retardation," those terms will be used interchangeably.

at Florida Mentor Facility, in Pensacola, Florida. DYKES has been on the DD Waivers waitlist for over three years.

18.      DYKES desires to live independently. She is articulate and repeatedly requests to move to a supported living environment. She is capable of being employed and has received Supported Employment Coaching services through Vocational Rehabilitation. DYKES has interviewed for jobs and hopes to be gainfully employed so she can be more independent. She was forced to turn down a job offer when a prior ICF/DD where she was living would not provide transportation during the evening when her shift would end.

19.      DYKES no longer had support from natural sources when she reached the age of majority. She eventually became a resident at Lakeview Center. During discharge from Lakeview, DYKES was not apprised of the DD Waiver or its waitlist. She was placed in a privately owned ICF/DD and no longer received the services of a support coordinator, instead relying on her client advocate to seek services in her best interests. After several years in the ICF/DD, DYKES's client advocate learned of the DD Waiver.

20.      DYKES is capable of living in a supported living situation with the assistance of community services such as in-home supports and supported living coaching.

21.      Despite her desire and ability to live in a community setting, DYKES has remained at the ICF/DD with little to no hope of ever residing in the community. DYKES has been informed that enrollments to the DD Waivers have been limited to crisis enrollments. Because of DYKES' placement in an ICF/DD, she would never meet the definition of crisis as defined in Rule 65G-1.047 of the Florida Administrative Code.

22.      Section 393.065 of the Florida Statutes and Rules 65G-11.001-.003 of the Florida

6

Administrative Code appears to require DYKES' placement into waitlist prioritization Category 3.

23.     DYKES has not received notification of her prioritization assignment and any appealable rights she may have for that assignment.

24.     Because of DYKES's living situation in the ICF/DD, she will never meet the requirements for any of the preceding categories other than Category 3 and will, therefore, never move up in priority for enrollment on the waiver. Should the State continue to limit funding for only those deemed to be in crisis, DYKES will never be considered for enrollment on the DD Waiver and will remain segregated in contravention to the integrated setting she desires and for which she qualifies.

## DAVID WALKER

25.     The Plaintiff, David Walker ("WALKER"), is an individual diagnosed with mental retardation and cerebral palsy. He resides with other persons with developmental disabilities in a private cluster ICF/DD in Holly Hill, Florida. WALKER has been on the DD Waiver waitlist for seven years.

26.     WALKER files this complaint through his guardian advocate, Michele Beauregard of Deltona, Florida.

27.     WALKER requires assistance in daily living. He requires verbal prompts or assistance in eating, uses a wheelchair, requires assistance in shifting his weight or transferring, maintaining his personal hygiene and remaining safe. He would benefit from personal care assistance, adult day training program, and/or companion services.

7

28.     WALKER was previously a resident of Sunland, a state-run institution, and was then enrolled in the DD Waiver and lived in a group home. Due to illness, WALKER was admitted to a hospital and then a nursing home. While recovering at the nursing home, WALKER lost his placement at the group home. His public guardian at the time then placed WALKER in an ICF/DD, foregoing his DD Waiver services.

29.     In 2003, WALKER's current Guardian applied for the DD Waiver and WALKER was placed on the waitlist. WALKER has the ability and desire to reside in the community, but needs DD Waiver assistance to do so.

30.     WALKER has been informed that enrollments to the DD Waiver have been limited to crisis enrollments. Because of his placement in an ICF/DD, he would never meet the crisis definition.

31.     Florida Statutes Section 393.065 and Rules 65G-11.001-.003 of the Florida Administrative Code appear to require WALKER's placement in Waitlist Prioritization Category 3.

32.     WALKER has not received notice of his prioritization assignment, nor any appeal rights he may have.

33.     Because of WALKER's living situation in the ICF/DD, he will never meet the requirements for any of the preceding categories other than Category 3 and will, therefore, never move up in the enrollment of individuals to the waiver. Without funding for categories other than crisis, David will remain institutionalized as he will never be considered in crisis pursuant to APD's rules.

**LORETTA DAVIS**

34.     The Plaintiff, Loretta Davis ("DAVIS"), is an adult female of 56 years and residing in a private ICF/DD in LeCanto, Florida. It is uncertain if Defendants have registered DAVIS on the DD Waivers waitlist though her guardian has applied for her.

35.     In the ICF/DD, DAVIS has participated in leisure activities during the day that do not incorporate aggressive educational or functional training. DAVIS has had numerous accidents, including falls, and maladaptive behaviors that have continued without proper attention.

36.     DAVIS has been diagnosed as having cerebral palsy and intellectual disability. She has been determined to be disabled and eligible for an institutional level of care.

37.     DAVIS has been informed that enrollments to the DD Waiver have been limited to crisis enrollments. Because of her placement in an ICF/DD, she would never meet the definition of crisis. DAVIS would like to be in the community and participate in her choice of day training.

38.     Section 393.065 of the Florida Statutes and Rules 65G-11.001-.003 of the Florida Administrative Code appear to require placement of DAVIS into Category 3 of the waitlist prioritizations categories.

39.     DAVIS has not received notification of her prioritization assignment or any rights she may have to appeal.

40.     Because of DAVIS' living situation in the private ICF/DD, she will never meet the requirements for any of the preceding categories other than Category 3 and will, therefore, never move up in the enrollment of individuals to the waiver. Without funding for categories other than crisis, DAVIS will remain institutionalized as she will never be

9

considered in crisis pursuant to APD's rules.

## HEATHER YOUNG

41.      The Plaintiff, Heather Young ("YOUNG"), is a 21-year old woman diagnosed with mental retardation and orthopedic impairments, including paralysis. She has been on the DD Waivers waitlist for over four years.

42.      YOUNG entered Florida's foster care system at age 11 and should have transitioned to the DD Waiver once she aged out of the foster care system at age 18. However, that did not happen and she was instead placed on the DD Waivers waitlist.

43.      YOUNG has waited for community placements while being served in institutions and institution-like settings. She currently resides in a nursing home, unable to fully access the community or live in the community with supports.

44.      Despite her paralysis and orthopedic impairments, YOUNG uses one hand to effectively communicate with an alphabet board. She requires medical assistance with a gastric tube and tracheotomy, but valiantly overcame Methicillin-resistant Staphylococcus aureus (MRSA) and a year-long battle with needing a respirator. She is now respirator-free and able to live in the community with supports.

45.      YOUNG has been informed that enrollments to the DD Waivers have been limited to crisis enrollments. Because of her placement in a skilled nursing facility, she would never meet the definition of crisis.

46.      Florida Statutes Section 393.065 and Florida Administrative Code Rules 65G-11.001-.003 appear to require YOUNG's placement in Waitlist Prioritization Category 3.

47.     YOUNG has not received notice of her prioritization assignment or any appeal rights she may have.

48.     Because of YOUNG's age and living situation in the nursing facility, she will never meet the requirements for any of the preceding categories other than Category 3 and will, therefore, never move up in the priority for enrollment to the waiver. Unless the State ceases to allow only crisis enrollments, she will remain segregated in the nursing facility, never realizing the benefit of community services and the integration mandate of the ADA.

### MICHELLE CONGDEN

49.     The Plaintiff, Michelle Congden ("CONGDEN"), is a 34-year old woman diagnosed with mental retardation. She has been on the DD Waivers waitlist for 13 years.

50.     She currently resides with her sister and her sister's three young children. While on the waitlist, CONGDEN's father passed away and she moved in with her sister.

51.     CONGDEN's sister is the sole caregiver for CONGDEN and her own three children; she needs respite services for her sister in order to avoid institutionalizing her. CONGDEN has hit and pushed her caregiver's small children and her sister believes the recent outbursts to be caused by a lack of stimulation. CONGDEN is in need of a day program to maintain her skills and occupy her to prevent maladaptive behaviors. CONGDEN seeks a day program or companion, a personal care assistant for bathing and toileting and a behavioral analysis as services from the DD Waiver.

52.     APD uses general revenue funds for the provision of individual and family

11

services to waitlisted persons who have emergency needs critical to avoid a crisis situation.  However, using general revenue funds is precarious. CONGDEN's sister was notified that she could use nominal monies for CONGDEN, but would have to do so by the end of the month, leaving little time to coordinate CONGDEN's care or benefits.

53.     Florida Statutes Section 393.065 and Florida Administrative Code Rules 65G-11.001-.003 appear to place CONGDEN's in Waitlist Prioritization Category 6.

54.     CONGDEN has not received notice of her prioritization assignment nor any appeal rights she may have.

55.     Because of CONGDEN's age, the age of her caregiver, and her living situation, it would be decades before she met the requirements for any of the preceding categories other than Category 6 and will, therefore, never move up in the priority for enrollment to the waiver. CONGDEN is relegated to the very end of a waitlist without a chance of progression, giving rise to a subclass of persons who are precluded from participating in and receiving services other than through segregated, isolated, institutional placement.

56.     Without the day program, personal care assistance, and behavior analysis that CONGDEN seeks from the DD Waiver, her health, safety and welfare will decline. This places CONGDEN at risk of institutionalization.

**AMANDA PIVINSKI**

57.     The Plaintiff, Amanda Pivinski ("PIVINSKI"), is a 24-year old woman diagnosed with Autism Spectrum Disorder and residing with her parents. She has been on the DD Waivers waitlist for over 7 years.

58.     PIVINSKI is able to reside in the community, maintains a job, but continues to be

12

in need of services. Her employment was recently jeopardized by her need for a job coach. Without her mother's assistance as a job coach, PIVINSKI would not be able to maintain her employment and otherwise interact with others in community living.

59.    The defendant's categorization of those persons on the waitlist places PIVINSKI's parents in the precarious position of having to evict their own daughter in order to secure services for her before they die or become incapable.

60.    Florida Statutes Section 393.065 and the Florida Administrative Code Rules 65G-11.001-.003appear to require PIVINSKI's placement in Waitlist Prioritization Category 6.

61.    Because of her parents' age and living situation in her family home, she will never meet the requirements for any of the preceding categories other than Category 6 for several decades.

62.    Unless the defendants cease to admit only crisis enrollments, PIVINSKI will remain without services or forced to seek institutionalization to receive services.

63.    PIVINSKI needs employment supports to maintain her in the community. Skills PIVINSKI learned in school will regress if not utilized daily in her employment and community activities. PIVINSKI is at risk of institutionalization.

64.    PIVINSKI will also be subject to the continued growth of Category 5 which includes those expected to graduate from secondary school within the next 12 months. Without funding and enrollment for all categories, the State will never enroll those persons like PIVINSKI who are relegated to Categories 6 and 7, creating a sub-class of un-served persons who are precluded from participating in and receiving services unless

13

they enter segregated, isolated, institutional placements. This places PIVINSKI in

imminent risk of institutionalization.

## JOSHUA WOODWARD

65.     The Plaintiff, Joshua Woodward ("WOODWARD"), is a 22-year old man

diagnosed with Trisomy 21 and residing with his father and stepmother. He has been on

the DD Waiver waitlist for over three years.

66.     Because WOODWARD's parents are under 70 years of age, he is unlikely to ever

move to any of the higher categories. WOODWARD's father is in poor health and needs

assistance with his son.

67.     WOODWARD resides in the community, seeks competitive employment, and

needs services to maintain skills acquired in school. While he does not need much

assistance with activities of daily living, he needs assistance with speech therapy, an

employment coach, and behavior assistance.

68.     The defendant's categorization of waitlisted persons places WOODWARD's

parents in the precarious position of having to evict WOODWARD to secure services for

him before they die or become incapable of providing care.

69.     Unless the defendants cease to admit only crisis enrollments, WOODWARD will

remain without services or forced to seek institutionalization to receive services.

70.     WOODWARD will also be subject to the continued growth of Category 5 which

includes those expected to graduate from secondary school within the next 12 months.

Without funding to completely and continuously fund Category 5, the State will never

enroll those persons like WOODWARD who are relegated to Categories 6 and 7, creating

a sub-class of un-served persons who are precluded from participating in and receiving

services unless they enter segregated, isolated, institutional placements. Without the

speech therapy and behavior assistance, WOODWARD's skills attained in school are

likely to regress putting his health, safety and welfare in jeopardy. The inability of

WOODWARD to access needed services places him at risk of institutionalization.

### ALLYSA FERRARO

71.     The Plaintiff, Allysa Ferraro ("FERRARO"), is a young woman of 22 years

residing with her mother, who is under 70 years of age. She has been on the DD Waiver

waitlist for six years.

72.     FERRARO has been diagnosed as having a developmental disability, specifically

Dandy Walker malformation, and resides with her mother.

73.     FERRARO had back surgery in 2002 and no longer walks on her own. She

utilizes a wheelchair for mobility although her mother believes she could walk if given

physical therapy. FERRARO can climb into and out of the shower.

74.     FERRARO resides in the community, wants to attend adult day training, and

needs services to maintain skills acquired in school.

75.     Because FERRARO's caregiver is under 70 years of age, she is unlikely to ever

move to any of the higher categories. Yet, FERRARO's mother, her sole caregiver,

cannot meet FERRARO's needs without assistance.

76.     FERRARO's mother does not earn enough income to pay for FERRARO's adult

day program and a place for her to live; she is faced with moving from her current

apartment in order to pay for FERRARO's services on her own or institutionalizing

FERRARO. Currently, FERRARO's mother pays for the adult day program four days per week. On the fifth day, she either takes FERRARO to work with her or takes time off to care for FERRARO, attending doctor's appointments, or other activities.

77.    FERRARO's mother previously sought residential placement, but was told by the Agency for Persons with Disabilities ("APD") that if she placed FERRARO in the group home near her, she would have to pay for the services. Although FERRARO's mother does not desire to institutionalize her daughter, APD did not inform her of her right to receive services in an ICF/DD.

78.    FERRARO applied for and was denied crisis enrollment four times. Instead, Defendants VAUGHAN and APD provided FERRARO with adult day training program and speech therapy services through general revenue funds, depriving FERRARO of the complete DD Waivers service array.

79.    The defendants' categorization of waitlisted persons places FERRARO's mother in the precarious position of having to evict her own daughter to secure services for her.

80.    Florida Statutes Section 393.065 and Florida Administrative Code Rules 65G-11.001-.003 appear to require FERRARO's placement in Waitlist Prioritization Category 6.

81.    Because of her mother's age and her residence in the family home, she will never meet the requirements for any of the categories preceding Category 6. Without the adult day training program she seeks, FERRARO is in imminent risk of institutionalization.

82.    Unless the defendants cease to admit only crisis enrollments, FERRARO will remain without services or forced to seek institutionalization to receive services.

16

83.     FERRARO will also be subject to the growth of Category 5 which includes those

expected to graduate from secondary school within the next 12 months. Without funding

to completely and continuously fund Category 5, the State will never enroll those persons

like FERRARO who are relegated to Categories 6 and 7, creating a sub-class of un-

served persons precluded from participating in and receiving services unless they enter

segregated, isolated, institutional placements. This places FERRARO in imminent risk of

institutionalization.

### DISABILITY RIGHTS FLORIDA

84.     The Plaintiff, Disability Rights Florida, Inc., d/b/a Disability Rights Florida,

formerly known as the "Advocacy Center for Persons with Disabilities, Inc.," (the

"P&A"), is a not-for-profit-corporation serving as Florida's federally funded protection

and advocacy system for individuals with disabilities. The P&A maintains offices in

Tampa, Hollywood and Tallahassee. Its main office is located at 2728 Centerview Drive,

Suite 102, Tallahassee, Leon County, Florida.

85.     The P&A's mission is to advance the quality of life, dignity, equality, self-

determination, and freedom of choice of people with disabilities through collaboration,

education, and advocacy, as well as legal and legislative strategies.

86.     Specifically, on behalf of persons with developmental disabilities, the P&A is

authorized by federal law to "pursue legal, administrative, and other appropriate remedies

or approaches to ensure the protection of, and advocacy for, the rights of individuals

within the State who are or who may be eligible for treatment, services, or habilitation, or

17

who are being considered for a change in living arrangements." 42 U.S.C. § 15043(a)(2)(A)(i).

87.     The P&A has represented and continues to represent persons with developmental disabilities in individual actions, class actions and systemic relief initiatives affecting all such individuals.

88.     The defendants' rules and policies adversely affect the substantial interests of the P&A, as clients and potential clients who are on the DD Waivers waitlist are not receiving needed services until they transition onto the DD Waivers.

89.     The P&A has standing to file this action as it provides representation and other legal services to persons receiving Medicaid services under the DD Waivers. *See Florida Institutional Legal Servs., Inc. v. Florida Parole & Probation Comm'n*, 391 So. 2d 247 (Fla. 1st DCA 1980). Additionally, challenging the defendants' policy falls within the P&A's general scope of interest and activity, and the relief requested, declaratory and injunctive, is the type of relief appropriate for the plaintiffs to receive on behalf of the individuals who the P&A is mandated to serve. *See NAACP, Inc. v. Florida Bd. of Regents*, 863 So. 2d 294 (Fla. 2003), *on remand*, 876 So. 2d 636 (Fla. 1st DCA 2004).

90.     The P&A and the individual plaintiffs are represented in this action by undersigned counsel.  Service should be made at the address of counsel as set forth below.

## DEFENDANTS

### ELIZABETH DUDEK

18

91.     The defendant Elizabeth Dudek (DUDEK) is the Secretary of Florida's Agency for Health Care Administration (AHCA) and is sued in her official capacity.  AHCA is the chief health policy and planning entity for the state, responsible for administering Florida's Medicaid Program, which includes the DD Waivers. *See* §§ 20.42(3) & 393.0661, Fla. Stat.

## BRIAN VAUGHAN

92.     The defendant Brian Vaughan (VAUGHAN) is the Interim Director of Florida's Agency for Persons with Disabilities and is sued in his official capacity.  Under Chapter 393 of the Florida Statutes, APD is responsible for providing all services to persons with developmental disabilities, including state-run ICF/DDs and the programmatic management of the DD Waivers. *See* § 20.197(3), Fla. Stat. APD administers the Medicaid DD Waiver program under an interagency agreement with AHCA.

## RICK SCOTT

93.     Governor Rick Scott (SCOTT) is the chief executive officer of the State of Florida. He is responsible for directing, supervising and controlling the executive departments of state government. Governor SCOTT is ultimately responsible for ensuring that Florida operates its long-term care system for people with disabilities in conformance with federal law. He is sued in his official capacity and only for prospective injunctive relief.

94.     Pursuant to Article IV § 1(a), Florida Constitution, Defendant SCOTT is the

"chief administrative officer of the state responsible for the planning and budgeting of the state."

95.     Pursuant to Executive Order Number 11-72, Office of the Governor, neither VAUGHAN nor DUDEK, may propose, repeal, or make changes to its administrative rules without first obtaining approval from SCOTT through his designee of delegated powers, the Office of Fiscal Accountability and Regulatory Reform (OFARR). OFARR has the specific delegated power from SCOTT to review executive office agencies' rules for their impact to "adversely affect the availability of professional or occupational services to the public [and] impose an unjustified overall cost and economic impact, including indirect cost to consumers." SCOTT has specifically delegated to OFARR the power to analyze the "impact of proposed and existing rules on matters of public health, public safety, public welfare" and to identify and review "actions taken by State agencies to improve program performance, meet program standards [and] promote economy and efficiency."

96.     DUDEK and VAUGHAN serve as the head of their respective agencies at SCOTT's discretion. SCOTT controls DUDEK and VAUGHAN through the power of removal and his ability to "inform such agency heads of the considerations that may lead to retention or removal"[4] whether informally or through formal communications such as Executive Order 11-72.

97.     SCOTT's statements and creation of OFARR evidence his intention to retain

_____

[4] SCOTT's "Response to Petition for Writ of Quo Warranto," Whiley v. Scott, Case No. SC 11-592, (where SCOTT maintains his authority as the ultimate decision maker and ability to control executive agencies exists informally even if OFARR did not exist).

close supervisory power over actions or omissions taken by VAUGHAN and DUDEK.

98.     VAUGHAN's and DUDEK's illegal actions and omissions have been sanctioned, either formally through OFARR, or informally directly through SCOTT.

99.     At all times relevant to this Complaint, the defendants were and are acting under color of state law and knew or should have known of the policies, practices, acts and conditions alleged herein.

## CLASS ACTION ALLEGATIONS

100.    Pursuant to Fed. R. Civ. P. 23 (a) and (b)(2), the named plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

101.    The proposed class consists of:

    a.  all eligible individuals who are enrolled on the DD Waiver waitlist and residing in institutions or institution-like settings, including but not limited to skilled nursing facilities;

    b.  all eligible individuals residing in institutions or institution-like settings who possess both the desire and capability to reside in the community with supports;

    c.  eligible individuals enrolled on the DD Waiver waitlist who would be or are assigned to categories three through seven; and

    d.  eligible individuals who will be subject to defendant's implementation of Florida's statute and rule to place them in waitlisted categories three through seven if they apply for the DD waiver in the future.

102.    Numerosity: The class is so numerous that joinder of all its members is

21

impracticable. The plaintiffs believe there are over 19,000 class members, as it is
believed that there are 19,000 individuals on the DD Waiver waitlist. Although the exact
number is known to the defendants and is ascertainable, plaintiffs do not know the exact
number of the individuals.

103.    Commonality: There are questions of law or fact that are common to all named
plaintiffs, as well as to all putative class members including:

    a.      Whether the defendants' policies unnecessarily cause and perpetuate the
    segregation and discrimination through continued institutionalization or risk of
    institutionalization of persons with developmental disabilities, violating the
    ADA's integration mandate as enforced through 42 U.S.C. § 1983.

    b.      Whether the defendants' relegation of persons with developmental
    disabilities to a waitlist that has not been effectively implemented or funded for
    over five years violates Medicaid Act's requirement for the provision of services
    with reasonable promptness pursuant to 42 U.S.C. § 1396a(a)(8) and 42 C.F.R.
    § 435.930 through 42 U.S.C. § 1983.

    c.      Whether the defendants' failure to enroll into the DD Waiver persons
    currently institutionalized and those turned away for crisis enrollment denies
    those plaintiffs the Medicaid Act's requirement for the freedom of choice of
    provider of services pursuant to 42 U.S.C. § 1396n(c)(2), enforced through 42
    U.S.C. § 1983.

    d.      Whether the Defendant's failure to inform those person on the DD Waiver
    waitlist of their prioritization categories and afford them an opportunity for

22

hearing deprives them of due process pursuant to 42 U.S.C. §1396a(a)(3), 42

C.F.R. 431.220.

104.   <u>Typicality:</u> The claims of the named plaintiffs are typical of the claims of the class

as a whole in that the named plaintiffs and purported class are Medicaid eligible

recipients who have been denied home and community based services by being placed on

a lengthy waitlist that has little to no hope of culminating in community based services

and no means to challenge their lack of prioritization by the Defendants..

105.   <u>Adequate representation:</u> The named plaintiffs will fairly represent and

adequately protect the interests of members of the class as a whole. The named plaintiffs

do not have any interests antagonistic to those of other class members. By filing this

action, the named plaintiffs have displayed an interest in vindicating their rights, as well

as the claims of others who are similarly situated. The named plaintiffs are represented by

counsel who are skilled and knowledgeable about civil rights litigation, Medicaid law,

practice and procedure in the federal courts, and the prosecution and management of class

action litigation.

106.   The defendants have acted or refused to act on grounds generally applicable to the

class, making final injunctive relief appropriate with respect to the class as a whole under

Fed. R. Civ. P. 23(b)(2). Although the specific disabilities of the class members vary,

they share a common need for services provided by the DD Waiver Program, have been

found to need and are eligible for these services as they meet the level of care required

for placement in an ICF/DD, have been denied an opportunity to receive prompt services

on the DD Waivers, and have been denied an opportunity to challenge their lack of

prioritization by Defendants.. A class action is superior to individual lawsuits for resolving this controversy.

## MEDICAID STATUTORY AND REGULATORY FRAMEWORK

### Medicaid Optional and Mandatory Services

107.    Medicaid is a joint federal/state program authorized by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v.  It provides medical assistance to low income individuals who meet certain eligibility requirements.

108.    States are not required to participate in the Medicaid Program. If a state elects to participate, however, it is required to comply with applicable federal statutory and regulatory requirements.

109.    The Medicaid program allows states to furnish persons (including those with developmental disabilities) "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self care." 42 U.S.C. § 1396.

110.    In addition to providing services that support the independence of program participants, the Medicaid Act requires that each state medical assistance program be administered in the best interests of the recipients. *See* 42 U.S.C. §1396a(a)(19).

111.    Federal funding is available to state Medicaid programs for both the provision of health care services and various administrative functions. The amount of federal funding available to a state is referred to as federal financial participation (FFP) and is determined by comparing a state's per capita income to the national average.

112.    The Medicaid state plan must identify the required and optional health care

services it will provide.

113.     In addition to the required services that each Medicaid program must provide, a state may choose any of thirty-four optional services to include in its plan. Each optional service a state offers must be provided consistent with all federal requirements.

114.     Placement in an ICF/DD is an optional Medicaid service. Florida opts to provide ICF/DD Medicaid services to persons who meet level of care criteria for placement in an ICF/DD. *See* § 409.906(15), Fla. Stat.  Thus, placement and receipt of services in an ICF/DD are an entitlement.

115.     In an ICF/DD, a client receives a continuous active treatment program, including "aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services ..., that is directed toward the acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and the prevention or deceleration of regression or loss of current optimal functional status."

116.     The Medicaid Act also requires that a state plan for medical assistance "must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).

117.     Federal regulations require that a state Medicaid agency must "furnish Medicaid promptly to recipients without delay caused by the agency's administrative procedures" and "continue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. § 435.930.

118.    Medicaid beneficiaries are allowed to choose their health care professionals from a range of participating providers. *See* 42 U.S.C. § 1396a(a)(23).

### Medicaid Waivers and Developmental Disabilities Service Delivery System

119.    Medicaid home and community-based services waiver programs are authorized by 42 U.S.C. § 1396n(c) and governed by 42 C.F.R. §§ 441.300-.310.  Waiver programs enable states to provide home and community-based services to individuals with developmental disabilities or mental retardation who would otherwise need the level of care provided in an ICF/DD.

120.    Florida Statutes Chapter 409 and Florida Administrative Code Rule 59G-13.080 authorize the Florida Medicaid Developmental Disabilities Waiver (DD Waivers). Florida's DD Waivers are home and community-based waivers, created to maintain persons with developmental disabilities in a home setting with supporting services necessary to prevent institutionalization.

121.    The DD Waivers program allows states to waive three specific Medicaid requirements: state-wideness, comparability of services, and community income and resource rules.

122.    A state's DD Waivers program must comply with all federal Medicaid requirements that are not specifically waived, including reasonable promptness.

123.    States apply to the Centers for Medicare & Medicaid Services (CMS) for permission to operate a home and community based waiver; waiver applications must be approved before implementation.

124.    When a state offers waiver services, it must inform individuals likely to require

nursing home or ICF/DD care about "any feasible alternatives available under the waiver" and give them the "choice of either institutional or home and community-based services." 42 U.S.C. § 1396n(c)(3). *See also* 42 C.F.R § 441.302(d).

**Florida Medicaid**

125.    Florida defines "ICF/DD" as a facility licensed under state law and certified under federal regulations to furnish health care, rehabilitative services, and other related services to individuals who have mental retardation, a developmental disability or related conditions. *See* FLA. ADMIN. CODE R.65G-1.010(131).

126.    Pursuant to Florida Statutes Chapters 409 and 393, Florida provides Medicaid services to persons with developmental disabilities. Florida defines "Developmental disability" as "a disorder or syndrome that is attributable to retardation, cerebral palsy, autism, spina bifida, or Prader-Willi syndrome; that manifests before the age of 18; and that constitutes a substantial handicap that can reasonably be expected to continue indefinitely." § 393.063(9), Fla. Stat.

127.    Under Federal and Florida Medicaid program statutes and rules, persons who meet level of care criteria for placement in an ICF/DD are also eligible to receive services in the community under the DD Waivers program.

128.    The purpose of the DD Waivers is to maintain eligible persons in the community and prevent institutionalization.

129.    ICF/DD's are considered institutional placements and annually cost more than services in the community.

**Florida's DD Waivers and ICF/DD Program**

130.    Florida has declared "the greatest priority shall be given to the development and implementation of community-based services that will enable individuals with developmental disabilities to achieve their greatest potential for independent and productive living, enable them to live in their own homes or in residences located in their own communities, and permit them to be diverted or removed from unnecessary institutional placements." § 393.062, Fla. Stat.

131.    Florida operates a four-tiered DD Waiver program. Each tier is a separate waiver and, per statute, has its own annual expenditure limit per individual. Tier 4 has the lowest annual expenditure limit and Tier One has the highest.

132.    The number of unduplicated recipients in the DD Waivers has been as high as 31,066.   Currently, there are fewer persons enrolled in the DD Waivers. Upon information and belief, Defendants have applied for and received approval for 31,500 unduplicated recipients for the DD Waivers.

133.    Defendants VAUGHAN and DUDEK control the number of recipients able to receive services through the DD waivers.

134.    For Fiscal Year 2010-2011, Florida appropriated $283,409,222 as the state's share for services to persons in the community. A federal match was provided to bring the amount to $805,826,618.

135.    APD's state-run developmental disabilities centers were appropriated $124,471,261 of state dollars for Fiscal Year 2010-2011.

136.    For fiscal year 2009-2010, there were 2,857 Medicaid recipients in privately

owned and operated ICF/DDs at a cost of $326,966,255.

137.    For state fiscal year 2009-2010, the average cost of a person in an ICF/DD was

approximately $114,000.00 per person annually. For state fiscal year 2009-2010, the

average cost of a person in the DD waivers was approximately $31,000.00.

138.    The number of waitlisted persons residing in privately owned and operated

ICF/DDs has increased since February 1, 2009.

**The DD Waiver Waitlist**

139.    Currently, there are over 19,000 individuals, both children and adults, on the DD

Waivers waitlist.

140.    Defendants steer individuals to accept unavailable waiver services while not

amending their waivers to accommodate an increase in participants, developing

additional providers, or increasing funding. Defendant's policies evidence an imbalance

of the delivery of services that belie its stated intent.

141.    APD has adopted rules to implement the waitlist categories pursuant to Florida

Statute §393.065(5). *See* FLA. ADMIN. CODE R. 65G-11.002. They are:

       a.  Category 1 includes individuals determined to meet the crisis criteria

          specified in Rule 65G-1.047of the Florida Administrative Code;

       b.  Category 2 includes children who are jointly served by the Agency and the

          Department of Children and Family Services ("DCF", also known as the

          Department of Children and Families) in the Child Welfare program;

       c.  Category 3 includes the following individuals:

             i.  Individuals for whom the caregiver has a condition or

circumstance that is expected to render the caregiver unable to provide care within the next twelve months and other caregivers are unable, unwilling or unavailable to provide care.

ii.   Individuals who are at substantial risk of incarceration or court commitment which is defined as unlawful activity by the individual that has required the intervention of local or state law enforcement even if the unlawful activity did not result in an arrest or criminal charges.

iii.   Individuals who are currently incarcerated and are expected to be released within 12 months.

iv.   Individuals whose behaviors or physical needs place them or their caregiver at risk or harm within the next 12 months, and for whom no other supports are currently available to meet their needs.

v.   Individuals who are identified by the facility as ready for discharge from a state mental health hospital, intermediate care facility for the developmentally disabled, a skilled nursing facility, correctional facility, or a secure forensic facility within the next 12 months.

vi.   Individuals receiving Voluntary Protective Services (VPS) or requesting DCF assistance to prevent their child from entering foster care.

d.   Category 4 includes individuals whose primary caregiver is age 70 years

of age or older and no other alternate caregiver is available, willing or able
to provide support.

e.   Category 5 includes individuals who are expected to graduate from
secondary school within the next 12 months, individuals who have
received a special diploma and need the support available through waiver
funded services to obtain or maintain competitive employment, or
individuals who have applied for and been accepted to an accredited
institution for postsecondary education.

f.   Category 6 includes individuals who are 21 years of age or older, and do
not meet the criteria for any other category.

g.   Category 7 includes those individuals who are younger than 21 years of
age and who do not meet the criteria for any other category.

142.   As of July 1, 2010, APD reported that 37.2% of those on the waitlist had been
waiting for community services longer than five years and 12.2% had been waiting for
four to five years.

143.   As of February 2011, 16% of those persons registered for the waitlist were
categorized by APD as Category 3. Categories 6 and 7 contain the next highest numbers
of waitlisted persons. Roughly 8% were not yet categorized by APD.

144.   Despite the legislative intent of Chapter 393 of the Florida Statutes, there has been
no expansion of DD Waiver funding or waiver enrollments available to non-crisis
Medicaid eligible recipients.

145.   For at least the past five years, new DD Waiver enrollees have been funded only

through attrition, meaning persons currently enrolled in the DD Waiver must become ineligible, move out of state, or die before funds are available for waitlisted persons.

146.     The defendants provide minimal services to waitlisted persons through general revenue funds to stave off DD Waiver crisis enrollment or institutionalization.

147.     As of December 2010, 1,137 persons on the waitlist received APD non-Medicaid services through state General Revenue and social services block grants.

148.     The use of general revenue funds does not draw down federal matching funds and deprives the individual of the full array of DD Waiver services.

149.     Those persons enrolled through crisis have APD's designation of homeless, without a caregiver, or a danger to themselves or others because of behaviors.

150.     Persons enrolled through crisis have increased and more substantial needs requiring sufficient providers and quality services to maintain them in the community.

151.     Funding for the DD Waivers has steadily decreased to 2005-2006 levels.

152.     SCOTT instructed the Inspector General's audit of APD to specifically identify a historical financial crisis in order to reduce DD Waiver provider rates by 12.5% by executive order.

**Unnecessary Institutionalization of Florida Citizens**

153.     At present, there are approximately 198 persons with developmental disabilities residing in private ICF/DDs who are registered on the DD Waivers waitlist.

154.     Another 1,136 persons with developmental disabilities currently registered for the DD Waiver waitlist reside in what APD terms "other." This includes psychiatric

facilities, large group homes, state-run non-ICF/DD facilities, and other institutional-like settings.

155.    Additionally, 69 persons with developmental disabilities registered for the DD Waivers waitlist reside in state-run ICF/DDs.

156.    In further contravention of its stated intent, Florida's numbers in nursing home admissions for persons with developmental disabilities has risen steadily in recent years.

157.    At present, there are approximately 115 persons with developmental disabilities residing in nursing homes registered for the DD Waivers waitlist.

158.    Persons on the waitlist languish for years without DD Waiver services that meet their needs in the most integrated setting possible.

159.    APD's waitlist of over 19,000 people evidences the community's preference for DD Waiver services over institutions and other institutional-like settings.

160.    Despite Florida's intention to concentrate its efforts to meet the growing demand for community services, Florida continues to serve individuals in costlier institutional settings, including ICF/DDs and nursing homes, whether state or privately operated.

## COUNT ONE

## REASONABLE PROMPTNESS

161.    Paragraphs 1 through 160 are incorporated by reference.

162.    This count is brought pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396a, 42 C.F.R. § 435.930, and 42 U.S.C. § 1983.

163.    The defendants voluntarily participate in the federal Medicaid program under 42 U.S.C. § 1396 *et seq.*

164.     Federal law requires that any state which elects to participate in the Medicaid program to provide all services, including DD Waiver services, to eligible individuals with reasonable promptness.

165.     The defendants have failed and continue to fail to provide adequate DD Waiver services with reasonable promptness by developing and implementing policies designed to place Medicaid eligible individuals with developmental disabilities on a waitlist for waiver services with no real chance of ever enrolling in the DD Waiver and realizing the benefits of community integration.

166.     The defendants' operation of the DD Waiver has resulted in five years of stagnant growth where an enrolled person would either have to die or move out of state in order for a DD Waiver slot to be available to a new enrollee that then has to meet the definition of crisis.

167.     The unavailability of services in the community relegates Medicaid eligible persons with developmental disabilities to a waitlist placement for years, violating the reasonable promptness provisions of Title XIX of the Social Security Act, 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930.

168.     The consequence of the defendants' actions is the costlier placement of persons with disabilities in inappropriate settings such as large ICF/DDs, psychiatric facilities, and nursing facilities.

169.     SCOTT, VAUGHAN and DUDEK have failed to design and identify a comprehensive, effectively working plan to meet their obligation under the ADA in order to provide services to the putative class in a reasonably prompt manner.

34

170.    VAUGHAN and DUDEK have failed to remove barriers in their rules, policies, and implementation of their programs for the putative class to receive services in the community in a reasonably prompt manner.

171.    SCOTT has approved VAUGHAN's and DUDEK's rules to impose barriers to the putative class in receiving community services in a reasonably prompt manner.

172.    SCOTT's agent, OFARR, has omitted VAUGHAN's and DUDEK'S barrier-creating rules from the list of rules to be modified, repealed or amended.

173.    SCOTT continues to violate the putative class' rights in receiving community services in a reasonably prompt manner until he authorizes approval of the repeal, modification and change to VAUGHAN's and DUDEK's rules to remove those barriers.

174.    VAUGHAN, DUDEK, and SCOTT continue to constrain the DD Waivers' services, funding, and available slots while allowing the numbers of persons residing in institutional settings to increase.

175.    The plaintiffs have suffered harm and will continue to suffer harm as a direct and proximate result of defendants' violations of the Medicaid Act and implementing regulations.

176.    Named plaintiffs, DYKES, WALKER, DAVIS and YOUNG, as well as those similarly situated, will never qualify for crisis because of their placements in institutions and are dependent upon SCOTT, VAUGHAN and DUDEK to develop and implement a comprehensive, effectively working plan and resource allocation so that all categories of Florida's waitlist prioritizations receive services in the most integrated setting possible in a reasonably prompt manner.

177.    Named plaintiffs, CONGDEN, PIVINSKI, WOODWARD , FERRARO and those similarly situated, have been placed on a waitlist for services that are likely to take decades to materialize putting them at risk of institutionalization due to the lack of services in a reasonably prompt manner.

## COUNT TWO

### FREEDOM OF CHOICE

178.    Paragraphs 1 through 160 and 165 through 174 are incorporated by reference.

179.    This count is brought pursuant to 42 U.S.C. § 1983.

180.    The defendants engage in a pattern and practice that forces plaintiffs to forgo any Medicaid services and to languish on the waitlist until their caregivers are incapacitated or die for enrollment in the DD Waiver to occur.

181.    The defendants' pattern and practice violates statutory freedom of choice requirement under the Social Security Act, § 1915(c)(2), as amended, 42 U.S.C. § 1396n(c)(2), as defendants  require Medicaid eligible individuals to choose between (1) an indefinite and lengthy placement on the DD Waivers waitlist without services, or (2) placement in an ICF/DD or other institutional setting with services but decreased independence, where they would be frozen in category 3.

182.    SCOTT, VAUGHAN and DUDEK have failed to provide the freedom of choice of services to the putative class as required by 42 U.S.C. § 1396n(c)(2).

183.    SCOTT has affirmatively permitted VAUGHAN and DUDEK, through SCOTT's specific instructions and delegation of powers, to continue to allocate scarce resources to

institutions and institutional-like settings to the detriment of community services in the DD Waivers.

184.    SCOTT's OFARR has allowed VAUGHAN's and DUDEK's rules to continue the isolation and segregation of registered waitlisted persons in institutions and institutional-like settings in violation of their freedom of choice as delineated in 42 U.S.C. §1396n(c)(2).

185.    SCOTT has failed to instruct VAUGHAN and DUDEK to identify and assess those persons not registered on the waitlist but residing in institutions or institutional-like settings for community placements as part of his duties as the chief administrative officer of planning and budgeting.

186.    VAUGHAN and DUDEK have failed to remove barriers in their rules, policies, and implementation of their programs for the putative class to exercise their freedom of choice to receive services in the community.

187.    SCOTT has allowed and permitted VAUGHAN and DUDEK's rules to impose barriers to the putative class to exercise their freedom of choice in receiving community services by omitting them from OFARR's list of rules to be modified, repealed or amended. SCOTT failed to identify VAUGHAN's and DUDEK's rules as ones that adversely affect the availability of professional or occupational services to the public and impose an unjustified overall cost and economic impact, including the indirect cost to consumers; and failed to analyze the impact of those rules on the matters of public health, public safety, and public welfare.

188.    The defendants' pattern and practice to forgo continued counseling of the right to

37

elect to receive services in the community after placement in an institution or institution-like facility violates statutory freedom of choice requirement under the Social Security Act, § 1915(c)(2), as amended, 42 U.S.C § 1396n(c)(2).

189.    Named plaintiffs, DYKES and WALKER, were placed in ICF/DDs despite their desire and ability to reside in the community. DYKES and WALKER were unable to secure enrollment in, or even placement on the waitlist for, the DD Waiver due to the unavailability of family or advocates at the time of their placement in the ICF/DDs.

190.    VAUGHAN failed to identify DYKES, DAVIS and WALKER as able to live in the community and to ensure their eligibility and registration for the DD Waivers upon admission to the institution.

191.    The defendants failed to provide the necessary choice counseling to ICF/DD residents to determine whether an integrated setting is more appropriate for them.

192.    The defendants do not routinely and continuously identify ICF/DD residents who can live in the community and desire to do so.

193.    The defendants do not have a proactive plan to use their professional judgment to identify the most appropriate integrated setting, and often the less costly setting, for ICF/DD residents.

194.    Named plaintiff, YOUNG, was placed in a nursing home despite having the ability to reside in the community for less cost with appropriate services.

195.    YOUNG qualifies for the DD Waiver based upon her disability. The DD Waiver offers an array of services capable of meeting YOUNG's needs to reside in the community and YOUNG has chosen to apply for the DD Waiver.

196.    The defendants have failed to identify all DD Waiver eligible persons that have been diverted to nursing homes, and to routinely and continuously offer choice counseling to those persons to ensure they are in the most appropriate integrated setting .

197.    Due to their placement on the DD Waivers waitlist, named plaintiffs, CONGDEN, WOODWARD, FERRARO and PIVINSKI, are denied the freedom of choice of providers, as the only provider available to them is an institution.

## COUNT THREE

## AMERICAN WITH DISABILITIES ACT and SECTION 504 OF THE REHABILITATION ACT

198.    Paragraphs 1 through 160, 165 through 174, and 183 through 197 are incorporated by reference.

199.    This count is brought pursuant to 42 U.S.C. § 1983.

200.    The defendants are public agency directors responsible for operation of a public entity, pursuant to 42 U.S.C. §§ 12131(1)(A)&(B).

201.    The defendants direct state agencies that receive federal financial assistance.

202.    The defendants' pattern and practice in its administration of the Medicaid waiver program violates the ADA, 42 U.S.C. § 12101 *et seq*., in that Florida continues to fund unnecessary placements of individuals with similar disabilities in ICF/DDs at the expense of those individuals seeking services in the community, to the detriment of both groups.

203.    Pursuant to the ADA, public entities, including the defendants, must administer services, programs and activities in "the most integrated setting appropriate" to the needs

of qualified individuals with disabilities. *See* 28 C.F.R. § 35.130(d).

204.    The ADA's implementing regulations further provide that "a public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration: (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities…" 28 C.F.R. § 35.130(b)(3).

205.    Section 504 of the Rehabilitation Act of 1973 also contains an integration mandate for recipients of federal funds. See 29 U.S.C. § 794.

206.    Section 504's regulations prohibit recipients of federal financial assistance from:

> Utiliz[ing] criteria or methods of administration…(i)that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons.

45 C.F.R. § 84.4(b)(4); 28 C.F.R. § 41.51(b)(3)(1).

207.     28 C.F.R. § 41.51(d) requires a public entity to administer its services, programs and activities "in the most integrated setting appropriate" to the needs of qualified individuals with disabilities.

208.    The defendants have funded unnecessary and costlier institutional placements for eligible individuals, to the detriment of the named plaintiffs and class members awaiting services through the community.

209.    The defendants' practice of unnecessarily allocating these funds for institutional

40

long-term care contravenes the stated intent of Florida Statutes Section 393.062, violates the ADA, and violates Section 504 of the Rehabilitation Act.

210. The defendants have unnecessarily institutionalized plaintiffs and class members by (1) failing to properly assess the services and supports needed to reside in the community and (2) failing to inform the plaintiffs and class members of available community services upon admission and thereafter to the ICF/DDs, nursing homes, and other institution-like settings.

211. The defendants' diversion of resources and categorization of waitlisted persons consequently results in only crisis enrollments to the DD Waivers, perpetuating the unnecessary segregation of those in institutions and virtually locking the doors so that no resident will ever receive community services.

212. The defendants' use and administration of Medicaid resources violates the anti-discrimination provision of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, by limiting community-based care while allowing institutional care to rise.

213. The result of the defendants' actions and inactions is that eligible individuals are forced to choose between forgoing services in order to remain in the community or forgoing independence to obtain services in institutional placements.

214. The defendants' patterns and practices subject the plaintiffs to harm and injury by segregating named plaintiffs and class members and indefinitely depriving them of social integration through failure to continuously assess whether the institutional placement is more appropriate than services provided in a community setting.

215.    The defendants' failure to provide DD Waiver services to named plaintiffs and class members in the community places them in jeopardy of receiving services in an institution, rather than in the most integrated setting appropriate to their needs, in violation of the integration mandate of the ADA and 504 of Rehabilitation Act, 42 U.S.C. § 12115 *et seq.*, 29 U.S.C. § 794, and the implementing regulations, and 28 C.F.R. §§ 35.130(d) and 41.51.

216.    SCOTT, VAUGHAN and DUDEK have failed to provide the most integrated setting possible to the putative class as required by the integration mandate of the ADA and in violation of Section 504 of the Rehabilitation Act.

217.    SCOTT has affirmatively permitted VAUGHAN and DUDEK, through SCOTT's specific instructions and delegation of powers, to continue to allocate scarce resources to institutions and institutional-like settings to the detriment of community services in the DD Waivers.

218.    SCOTT's OFARR allowed VAUGHAN's and DUDEK's rules and policies to continue the isolation and segregation of over 500 registered waitlisted persons, and others class members not yet registered for the waitlist, in institutions and institution-like settings in violation of the integration mandate of the ADA and Section 504 of the Rehabilitation Act.

219.    VAUGHAN and DUDEK have failed to remove barriers in their rules, policies, and implementation of their programs for the putative class to receive services in the community in accordance with the ADA and in violation of Section 504 of the Rehabilitation Act.

220.    SCOTT has allowed and permitted VAUGHAN's and DUDEK's rules to impose

barriers to the putative class in receiving community services by omitting them from

OFARR's list of rules to be modified, repealed or amended. SCOTT failed to identify

VAUGHAN's and DUDEK's rules as ones that: adversely affect the availability of

professional or occupational services to the public; impose an unjustified overall cost and

economic impact, including the indirect cost to consumers; or impact matters of public

health, public safety, and public welfare.

221.    YOUNG qualifies for the DD Waiver but cannot access those services because of

VAUGHAN's and DUDEK'S actions limiting community services. The DD Waiver

offers an array of services capable of meeting YOUNG's support needs to reside in the

community.

222.    VAUGHAN and DUDEK's administration of the DD Waivers waitlist subject the

named plaintiffs, DYKES, YOUNG, DAVIS and WALKER, and class members, to

permanent placement on the DD Waivers waitlist due to the prioritization of individuals

awaiting services pursuant to Section 393.065(5) of the Florida Statutes and Rules 65G-

11.001-.003 of the Florida Administrative Code.

223.     Defendants' actions and omissions subject the named plaintiffs, DYKES,

YOUNG, DAVIS and WALKER, and class members, to permanent placement on the DD

Waiver waitlist due to the accompanying policies to continue funding their own

unnecessary institutional placements in lieu of community services.

224.    Defendants' actions and omissions subject the named plaintiffs CONGDEN,

WOODWARD, FERRARO and PIVINSKI, and class members residing in the

community awaiting services, to a constructive permanent placement on the waitlist due to the continued allocation of scarce resources to unnecessary institutional placements in lieu of community resources. The defendants' actions and omissions described herein subject CONGDEN, WOODWARD, FERRARO and PIVINSKI and similarly situated class members to the risk of institutionalization.

## COUNT FOUR

### DENIAL OF DUE PROCESS

225.   Paragraphs 1 through 160, 165-174, 183-197, and 200-201are incorporated by reference.

226.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits states from depriving any person of life, liberty, or property, without due process of law. U.S. Const. Amend. XIV §1.

227.   Plaintiffs have a constitutionally protected property interest in Medicaid benefits.

228.   State plans must provide for granting an opportunity for a fair hearing before the state agency to any applicant whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness. 42 U.S.C. §1396a(a)(3), 42 C.F.R. § 431.220.

229.   VAUGHAN and DUDEK have failed to provide notice to DYKES, WALKER, DAVIS, YOUNG, CONGDEN, PIVINSKI, WOODWARD and FERRARO of their right to a hearing upon their application for the DD Waiver and their placement into a waitlist prioritization category pursuant to 42 C.F.R. § 431.206, § 431.220.

## RELIEF REQUESTED

Plaintiffs request the following relief be granted:

a.   Certify this action as a class action pursuant to Fed. R. Civ. P. 23.

b.   Declare that the defendants' failure to provide named plaintiffs and class members with services in the most integrated setting appropriate to their needs violates Title II of the ADA, Section 504 of the Rehabilitation Act.

c.   Declare that the defendants' rules, policies and actions violate the Medicaid Act's freedom of choice and reasonable promptness provisions. Social Security Act, § 1915(c)(2), as amended, 42 U.S.C. §§ 1396a(a)(8) & 1396n(c)(2), and 42 C.F.R. § 435.930.

d.   As to the class members residing in family homes, enter a Permanent Injunction requiring the defendants to:

i.   Inform named plaintiffs and class members that they may be eligible for publicly-funded community services and that they have the choice of such services; and

ii.   Determine eligibility for those desiring community services and notify them in writing with due process rights for hearing in adverse determinations; and

iii.   Conduct assessments and preliminary support plans that are centered on needs, and not available resources, through person-centered planning; and

    iv.  Ensure coverage of long-term care services and supports in the community by enrolling those eligible individuals most at risk of institutionalization as determined by their assessments and preliminary support plans; and

    v.  Determine the cost to enroll all class members residing in family homes and design and implement a comprehensive effective working plan to enroll those individuals in a reasonably prompt manner.

e.  As to the class members residing in institutions or institutional-like settings, enter a Permanent Injunction ordering the defendants to:

    i.  Inform named plaintiffs and class members that they may be eligible for publicly-funded community services and that they have the choice of such services; and

    ii.  Determine eligibility for those desiring community services and notify them in writing with due process rights for hearing in adverse determinations; and

    iii.  Require waiver support coordinators to be assigned to develop discharge plans, support plans and individualized habilitation programs through person-centered planning for each plaintiff and class member;

    iv.  Transition each plaintiff and class member who desires to reside in the community with effective developmental services to the most integrated community setting appropriate with the necessary support services to meet the individual's needs;

46

v.   Make available the necessary alternative residential facilities, home services and vocational and day services in the community to allow the individual to reside in the most integrated setting appropriate.

f.   Order the defendants to remove arbitrary administrative barriers which prevent class members from accessing individualized home and community based waiver services without alleging or facing a crisis situation precedent.

g.   Order the defendants to provide plaintiffs and class members with necessary services to enable them to live in the community with reasonable promptness through the development of a comprehensive effective plan to eliminate and enroll persons from the DD Waiver waitlist.

h.   Order the defendants to provide plaintiffs with notice of their denial for DD Waiver services, placement on the waitlist and assigned prioritization category together with their hearing rights.

i.   Order the defendants to determine the eligibility of and enroll class members relegated to categories of the waitlist that do not incorporate crisis and to continue enrolling those individuals at a reasonable rate and pace so that a comprehensive effective working plan to eliminate the waitlist exists.

j.   Order the defendants to develop a reliable and accurate means of tracking and projecting service demand and associated trends in order to maintain a comprehensive effective working plan to enroll persons from the DD Waiver waitlist with reasonable promptness.

47

k.   Award named plaintiffs and class members their reasonable attorneys' fees,

litigation expenses and costs.

l.   Grant such other relief as the court deems just and proper.

DATED in Tallahassee, Florida on this 8th day of July, 2011.


By _____s/ Amanda Heystek_____
   Amanda Heystek, Esquire
   Florida Bar No. 0285020
   **Disability Rights Florida**
   1000 N. Ashley Drive, Suite 640
   Tampa, Florida 33602
   (850) 488-9071  Telephone
   (850) 488-8640  Facsimile
   amandah@disabilityrightsflorida.org
   Lead Trial Counsel


By _____s/ Paul E. Liles_____
   Paul E. Liles, Esquire
   Florida Bar No. 0921270
   **Disability Rights Florida**
   Senior Trial Counsel
   paull@disabilityrightsflorida.org
   Christopher White,  Esquire
   Florida Bar No. 0060109
   christopherw@disabilityrightsflorida.org
   1000 N. Ashley Drive, Suite 640
   Tampa, Florida 33602
   Maryellen McDonald,
   Director of Legal and Advocacy Services
   Florida Bar No. 607533
   maryellenm@disabilityrightsflorida.org
   2728 Centerview Drive, Suite 102
   Tallahasseee, FL 32301
   (850) 488-9071  Telephone
   (850) 488-8640  Facsimile