IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**JOANNA DYKES, et al.,**

    **Plaintiffs,**

vs.                                      **CASE NO. 4:11cv116/RS-WCS**

**ELIZABETH DUDEK in her
official capacity as Secretary of the
Florida Agency for Health Care
Administration, et al.,**

    **Defendants.**

_____

Before me are Plaintiffs' Motion for Class Certification (Doc. 61) and Defendants' Response in Opposition (Doc. 69).

## Standard of Review

Plaintiffs seek class certification under Fed. R. Civ. P. 23. "Rule 23 does not set forth a mere pleading standard." Rather, a party seeking class certification must "affirmatively demonstrate [their] compliance with the Rule -- that is, [they] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citation omitted). "[It] sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* "Certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule

23(a) have been satisfied." *Id*.

## Background

This is a purported class action by individuals with developmental disabilities who are eligible to receive Medicaid. (Doc. 30, ¶ 1). Plaintiffs receive care in one of two settings: in intermediate care facilities for the developmentally disabled ("ICF/DD") or in the community under Florida's Home and Community Based Services Waiver program ("DD Waiver"). Plaintiffs contend that Defendants have a lengthy waitlist for the DD Waiver program. The waiting period may exceed more than five years in some cases. *Id*. at 2-3. Plaintiffs also contend that Defendants have limited the funding for the DD Waiver program which results in a portion of institutionalized patients never being enrolled. Plaintiffs allege that Defendants' management of the DD Waiver program violates the reasonable promptness provisions of the Social Security Act ("SSA"), 42 U.S.C. § 1396(a)(8), violates the "Freedom of Choice" provisions of the SSA, 42 U.S.C. § 1915(c)(2), as amended, 42 U.S.C. § 1396n(c)(2), violates the Americans with Disabilities Act and the Rehabilitation Act, 42 U.S.C § 12101 *et seq*, 29 U.S.C §794, and is a violation of Plaintiffs Due Process rights under the Fourteenth Amendment.

## Analysis

To meet their burden, Plaintiffs must first demonstrate four perquisites—numerosity, commonality, typicality, adequacy. Rule 23(a) provides:

"A class may sue . . . on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class."

Second, the proposed class must satisfy at least one of the three requirements of Rule 23(b). Plaintiffs rely on Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declarative relief is appropriate respecting the class as a whole."

**Threshold Issue: Standing**

Article III of the United States Constitution limits the role of the federal judiciary to resolving cases and controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560, 112 S. Ct. 2130, 2136 (1992). Standing is a core component of this Article III requirement that must be established by litigants before a court may exercise jurisdiction over their claims. *Id*. at 560, 112 S. Ct. at 2136. The rules allowing the creation of class actions cannot be used to circumvent this most fundamental requirement. "No class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). *See also Conigliaro v. Norwegian Cruise Line*, 2006 U.S. Dist. LEXIS 95576, *14-15 (S.D. Fla. 2006) (*quoting Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005) ("The proposed class description

"'must not be so broad as to include individuals who are without standing to maintain the action on their own behalf.'").

Here, the proposed class includes "all individuals meeting the level of care requirements for placement in an ICF/DD who are enrolled on the DD Waiver waitlist…" (Doc. 61, p.2). This class includes "subclasses of those who (1) receive services in institutions or institutional-like settings and (2) reside in the community without services." *Id*.

The second subclass ("community plaintiffs") identified by Plaintiffs does not run afoul of standing jurisprudence. The "injuries" suffered by those who currently reside in the community are sufficient to confer standing. Plaintiffs Congden, Pivinski, and Woodward are in this subclass and reside in their communities. They are not institutionalized.

The doctrine of standing requires (1) that Plaintiff must have suffered an injury-in-fact; (2) that there must be a causal connection between the injury and the conduct complained of; and (3) that it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision. *Lujan,* at 560-561, 112 S. Ct. at 2136.

### A. Injury-in-Fact

The injury-in-fact must be both "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Fla. Wildlife Fed'n., Inc. v. S. Fla. Water Mgmt. Dist*., 647 F.3d 1296 (11th Cir. 2011) (citation omitted). Plaintiffs need not wait for an injury to occur. Rather, an allegation of future injury satisfies this prong of standing so long as the alleged injury "is likely to occur, and likely to do so

immediately." *31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003) *(citing Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136).

Defendants assert that the community plaintiffs lack standing because they are "neither institutionalized nor at imminent risk of being institutionalized." (Doc. 69, p.7). Defendants miss the mark. It is not the threat of institutionalization which is a cognizable injury. Rather, the "waiting lists for enrollment on the DD Waivers where [the community plaintiffs] languish for years without services" are the injury.

Plaintiffs have standing because their claims are grounded in statute. Plaintiffs interpretation of the reasonable promptness provisions of the Social Security Act, 42 U.S.C. § 1396(a)(8), the "Freedom of Choice" provisions of the SSA, 42 U.S.C. § 1915(c)(2), as amended, 42 U.S.C. § 1396n(c)(2), and the Americans with Disabilities Act and the Rehabilitation Act, 42 U.S.C § 12101 *et seq*, 29 U.S.C §794 are the subject of this dispute. Whether they succeed or fail will be determined on the merits of their arguments. Defendants contend that Plaintiffs have no valid cause of action under the SSA or the ADA, and therefore have no standing. (Doc. 69, p.6-7). Whether Plaintiffs' cause of action is valid will be determined outside the standing context.

Plaintiffs are incorrect in their standing analysis to the extent that they claim that the threat of institutionalization confers standing. Plaintiffs claim that the community plaintiffs are on the "continuum of [the] path to institutionalization." (Doc. 61, p.12). For the community plaintiffs, the threat of institutionalization is speculative and is not relevant.

**Class Certification**

   **A. Commonality and Typicality**

The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, n.5 (2011) (*citing General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-158, n. 13 (1982).

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id*. This does not mean merely that they have all suffered a violation of the same pro-vision of law. Rather, "what matters to class certification . . . is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (citation omitted).

Here, the main obstacle to class certification is the disparity between the two subclasses: the institutional plaintiffs are far different from the community plaintiffs.

Most problematic is that the law treats institutional and community plaintiffs differently. That is, undue institutionalization qualifies as discrimination under the ADA. *Olmstead v. L. C. by Zimring*, 527 U.S. 581, 597-598 (1999). But, it is unclear whether exclusion from community based programs qualifies as discrimination. Thus, the

institutionalized plaintiffs articulate a recognized cause of action. But, the community plaintiffs will have more difficulty arguing their case. Answering the uncertainly in the community plaintiff's ADA claim will be central to their case, but inconsequential to the institutional plaintiffs. This difference in established law is fatal to creating a class which contains both groups.

A second problem that arises between the two groups is how Florida law treats them. FLA. STAT. § 393.065(5) establishes the priority of those seeking waiver services:

> Except as otherwise directed by law, beginning July 1, 2010, the agency shall assign and provide priority to clients waiting for waiver services in the following order:
>
> (a) Category 1, which includes clients deemed to be in crisis as described in rule.[1]
>
> (b) Category 2, which includes children on the wait list who are from the child welfare system with an open case in the Department of Children and Family Services' statewide automated child welfare information system.
>
> (c) Category 3, which includes, but is not required to be limited to, clients:
>    1. Whose caregiver has a documented condition that is expected to render the caregiver unable to provide care within the next 12 months and for whom a caregiver is required but no alternate caregiver is available;
>    2. At substantial risk of incarceration or court commitment without supports;
>    3. Whose documented behaviors or physical needs place them or their caregiver at risk of serious harm and other supports are not currently available to alleviate the situation; or
>    4. Who are identified as ready for discharge within the next year from a state mental health hospital or skilled nursing facility

---

[1] Florida Administrative Code § 65G-1.047 defines the crisis category. It includes the following: first priority as those who are homeless or living in an unsafe environment; second priority as those who exhibit behaviors that may create life-threatening situations or bodily harm; third priority as those who have caregivers in extreme duress and are not able to care.

>and who require a caregiver but for whom no caregiver is available.
>
>(d) Category 4, which includes, but is not required to be limited to, clients whose caregivers are 70 years of age or older and for whom a caregiver is required but no alternate caregiver is available.
>
>(e) Category 5, which includes, but is not required to be limited to, clients who are expected to graduate within the next 12 months from secondary school and need support to obtain or maintain competitive employment, or to pursue an accredited program of postsecondary education to which they have been accepted.
>
>(f) Category 6, which includes clients 21 years of age or older who do not meet the criteria for category 1, category 2, category 3, category 4, or category 5.
>
>(g) Category 7, which includes clients younger than 21 years of age who do not meet the criteria for category 1, category 2, category 3, or category 4. Within categories 3, 4, 5, 6, and 7, the agency shall maintain a wait list of clients placed in the order of the date that the client is determined eligible for waiver services.

The community plaintiffs in the lawsuit are in category six or higher. They suffer injuries different and distinct from the institutional plaintiffs. For example, Plaintiff Pivinski is a 24-year old woman who resides in the community and maintains a job. (Doc. 30, ¶57-58). She lives with her parents, and because of her parents' age and living situation, Pivinski will "never meet the requirements for any of the preceding categories other than Category 6 for several decades." *Id*. at ¶61. Plaintiffs contend that Pivinski will never be enrolled in the DD Waiver program, and that her caregivers must "evict their daughter before they die or become incapable" in order to make her eligible.[2] *Id*. at

---

[2] Plaintiff contends that only those in category one (the crisis category) are enrolled in the DD Waiver. (Doc. 30, ¶9).

¶59.  They contend that this situation places Pivinski in "imminent risk of institutionalization." *Id*. at ¶64.

Similarly, Plaintiff Woodward lives at home with his father and stepmother. He is 22-years old.  He "does not need much assistance with activities of daily living." *Id*. at ¶ 65-67.  Woodward is in Category 6 or 7.

Plaintiff Young, on the other hand, is an institutional plaintiff.  She currently resides in a nursing home and suffers from paralysis and other orthopedic impairments. *Id*. at ¶41-44.  Young requires medical assistance with a gastric tube and tracheotomy. Young is a Category 3.

Here, the hurdle to class certification is that the reasoning why the community plaintiffs are not enrolled in the DD Waiver program is different from the institutionalized plaintiffs.  The institutionalized plaintiffs are not enrolled in the waiver program because they "will never qualify for crisis (categorization) because of their placements in the institution."  (Doc. 30, ¶176).  That is, the fact that they are in the institution precludes their ability to get off the waitlist.  Not so for the community plaintiffs.  The reason they are not in the DD Waiver program is much more fact specific. The crisis category, the one from which Defendants allegedly fill the slots for the waiver program, includes individuals whose "current caregiver is in extreme duress and is no longer able to provide for the applicant's health and safety because of illness, injury, or advanced age."   FLA ADMIN. CODE §65G-1.047.  The institutionalized plaintiffs who are in an ICF/DD will never fall into this category.  However, many of the community plaintiffs will eventually find themselves in a situation where their caregivers are unable

to care for them. The two groups are on separate and distinct paths when it comes to categorization under Florida statute. The facts which keep them from the waiver program are different, making the combination into one class inappropriate.

A third problem is that the injuries suffered by the institutional plaintiffs are different from the community plaintiffs. The institutional plaintiffs are stuck in ICF/DD wanting to be in the community under the DD Waiver program. The community plaintiffs are in the community, want to remain there, and also want to be enrolled in the DD Waiver program. They fear institutionalization, but are not institutionalized. The harm of not being in the DD Waiver program has different consequences for the two classes of plaintiffs. The community plaintiffs are largely where they would be if they were in the program. For them, the issue is mainly about resources. The institutional plaintiffs are in a completely different situation. The issue for them isn't so much funding as it is the actual setting.[3]

Finally, there is a conflict of interest between the two groups. The institutional plaintiffs, many of whom are in higher priority categories, have a different agenda than the community plaintiffs, many of whom are in a lower priority category. For example, given that there are a fixed number of slots in the waiver program, the institutionalized plaintiffs and those in higher priority would want to take those slots. They are invested in keeping the status quo of prioritization. The lower priority candidates, like the

---

[3] Plaintiffs may argue that the risk of institutionalizing makes the two classes sufficiently common. However, the possibility of institutionalization is mere speculation. For example, while Plaintiffs portray plaintiff Pivinski's situation as extraordinarily dire, Piviniski's categorization belies this claim. Because she is in category six, her caregivers must be younger than 70 years of age, and the caregivers do not have conditions which are expected to render them unable to provide care within the next 12 months. Fla. Stat. § 393.065(5). While the choice to keep her at home, rather than put her in an institution may be a difficult one, Pivinski and the others have not demonstrated that they are in imminent risk of institutionalization

community plaintiffs, have an interest in changing the prioritization regime. Their interest is to jump ahead or at least supplement higher prioritized candidates on the waitlist. For example, the community plaintiffs may argue that the length of time on the waitlist should be a critical factor in considering who gets into the DD Waiver program. The institutional plaintiffs and other higher priority candidates could disagree and contend that physical condition and status as institutionalized individuals should be a priority. In short, both groups are competing for the same scarce resources.

This simple illustration demonstrates why an approach combining the community plaintiffs and institutional plaintiffs into one class is untenable. A Category Six individual is far different from a Category Three individual. Numerous factors are considered when making these determinations: the age and health of caregivers; the age and condition of the individual; the effect of time on these conditions; the resources of the individual and her caregivers; and whether the individual is enrolled and will graduate from school. The interests of those in lower prioritization categories may be diametrically opposed to those in higher prioritization categories.

Plaintiffs' Motion for Class Certification (Doc. 61) is **DENIED**.


**ORDERED** on October 14, 2011.

/S/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**